UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

JOSEPH R. COLON,

                    Plaintiff,

                                          **NOT FOR PUBLICATION**

          -against-

                                          <u>**MEMORANDUM & ORDER**</u>

MICHAEL J. ASTRUE,                        10-CV-3779 (KAM)

Commissioner of Social Security,

                    Defendant.

----------------------------------------X

**MATSUMOTO, United States District Judge:**

          Pursuant to 42 U.S.C. § 405(g), plaintiff Joseph R.

Colon ("plaintiff") appeals the final decision of defendant

Commissioner of Social Security Michael Astrue ("defendant" or

the "Commissioner"), denying plaintiff's application for Social

Security Disability ("SSD") under Title II of the Social

Security Act (the "Act").[1]  Presently before the court is

defendant's unopposed motion for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure,

filed on April 12, 2011.  (<u>See</u> ECF No. 16, Notice of Motion

dated 4/12/2011; ECF No. 17, Memorandum of Law in Support of

---

[1]      Individuals may seek judicial review in the United States district
court for the judicial district in which they reside over any final decision
of the Commissioner of Social Security rendered after a hearing to which they
were a party, within sixty days after notice of such decision or within such
further time as the Commissioner may allow.  <u>See</u> 42 U.S.C. § 405(g).

Defendant's Motion for Judgment on the Pleadings ("Def. Mot.")
dated 4/12/2011.)

**BACKGROUND**

**I. Plaintiff's Personal and Employment History**

Plaintiff was born on August 26, 1965. (Tr. 13.) He
has a high school education. (Id.) Plaintiff is able to speak,
read, and write English. From 1990 until April 4, 2008,
plaintiff worked as a plasterer's helper for the New York City
Housing Authority. (Id. at 90.) His job consisted of mixing
plaster, pushing equipment in a wagon, and rebuilding walls with
plaster tiles. (Id. at 83.) Plaintiff spent the entire eight-
hour workday moving and frequently lifting 50 pounds or more
while carrying plaster bags to the mixing area. (Id.)

**II. Plaintiff's Medical History**

**A. Medical History Prior to April 4, 2008 Injury**

Plaintiff has asthma and has smoked about a pack of
cigarettes a day for 16 years. (Id. at 188, 232.) He was
treated in 2007 for acute bronchitis. (Id. at 187.)

On February 28, 2002, plaintiff saw Dr. Eli Bryk ("Dr.
Bryk"), orthopedic surgeon, for pinching pain and swelling on
the side of both knees. (Id. at 200.) The injury was work-
related. (Id. at 14.) Dr. Bryk diagnosed the pain as contusion
below the knees and prescribed range of movement and

strengthening exercises as well as pain modalities.  (Id. at 277.)

Plaintiff's physical therapy treatment was unsuccessful in treating the pain and on September 18, 2002, Dr. Bryk performed left knee arthroscopy.  (Id. at 203.)  Dr. Bryk's post-operative diagnosis was a partial tear of the anterior cruciate ligament and chondromalacia of the patellofemoral joint.  (Id.)  Dr. Bryk determined that plaintiff was able to return to work on March 3, 2003.  (Id. at 209.)  Thereafter, plaintiff returned to work.

## B.  April 4, 2008 Injury and Examinations

On April 4, 2008, while at work, plaintiff twisted his left knee, felt a pop, and was unable to straighten his leg. (Id. at 243.)  He was taken by ambulance to the emergency room of an unspecified hospital after his injury.  (Id. at 91, 243.)

After being discharged from the emergency room, plaintiff saw Dr. Gregory Montalbano ("Dr. Montalbano") for an orthopedic consultation on April 8, 2008.  (Id. at 243-44.)  Dr. Montalbano noted a "mild effusion" and "tenderness over the medial joint line," with a "range of motion . . . diminished in flexion with pain."  (Id. at 243.)  According to Dr. Montalbano, plaintiff at this time had a "marked partial disability," defined as "No lifting over 5-10 pounds" and "Able to perform

sedentary work." (Id.) Dr. Montalbano only saw plaintiff once
and did not evaluate him again. (Id. at 240.)

Thereafter, on April 17, 2008, plaintiff returned to
see Dr. Bryk, the orthopedic surgeon who had performed a left
knee arthroscopy on the plaintiff in September 2002. (Id. at
210.) In his April 2008 examination of plaintiff, Dr. Bryk
noted a "moderate effusion" about the left knee and tenderness
along the medial joint line. (Id. at 211.) Plaintiff reported
that he was taking over-the-counter Tylenol for pain, and Dr.
Bryk observed that plaintiff walked with an "antalgic gait
secondary to tenderness about the left knee." (Id. at 210.)

After April 2008, Dr. Bryk arranged for two follow-up
examinations of plaintiff's left knee. (Id. at 216-17.) On May
1, 2008, Dr. Bryk reported that plaintiff continued to complain
of persistent pain and swelling around the left knee. (Id. at
216.) Dr. Bryk noted a "moderate effusion" around the left knee
and tenderness along the medial and lateral joint lines, and
advised plaintiff to undergo an MRI examination. (Id.) At the
second follow-up examination on May 15, 2008, Dr. Bryk opined
that plaintiff suffered from a "persistent effusion" around the
left knee, with a range of motion from "-5 degrees of extension
to 120 degrees with tenderness." (Id. at 217.) The MRI
examination revealed a "vertical tear of the posterior horn of
the medial meniscus." (Id.) Dr. Bryk's impression was that

plaintiff suffered from a torn medial meniscus left knee, and he advised plaintiff to undergo an immediate "left knee arthroscopy with resection of intra-articular pathology." (Id.) Dr. Bryk noted that plaintiff "remains disabled and is unable to return to work." (Id.)

Also on May 15, 2008, plaintiff was examined by Dr. Hershel Samuels ("Dr. Samuels"), an orthopedic surgeon, for an independent medical evaluation for the Workers' Compensation Board. (Id. at 114-19.) Plaintiff reported pain in the left knee at the evaluation, but Dr. Samuels noted that plaintiff was "in no acute distress." (Id. at 116.) Dr. Samuels noted that plaintiff's appearance, posture, and gait were normal. (Id.) According to Dr. Samuels, there was no effusion in the left knee, and the range of motion was 0 degrees in extension to flexion at 120 degrees. (Id. at 117.) Dr. Samuels' diagnosis was a left knee contusion, and he recommended arthroscopic surgery for the left knee with post-operative physical therapy. (Id. at 118.) He also noted evidence of a "mild partial disability" and stated that plaintiff is "capable of working with restrictions of no squatting or bending and no lifting over 40 lbs." (Id. at 117.)

## C. **May 27, 2008 Surgery and Follow-Up Examinations**

On May 27, 2008, plaintiff underwent a left knee arthroscopy performed by Dr. Bryk. (Id. at 110.) Dr. Bryk's post-operation diagnosis was a torn medial meniscus, left knee synovitis, and chondromalacia patella. (Id.) He prescribed for Vicodin for one week and the use of a cane, to be discontinued as soon as possible thereafter. (Id. at 169.) The "Post-Operative Instructions" sheet notes that full activity was expected four to six weeks after surgery. (Id.)

On a follow-up examination on June 5, 2008, Dr. Bryk noted that plaintiff "is totally disabled at this time" and should avoid any activity that could interfere with a total recovery. (Id. at 226.) He directed plaintiff to begin extensive physical therapy. (Id.)

On June 3, 2008, plaintiff applied for Social Security disability benefits, alleging a disability onset date of April 4, 2008. (Id. at 67-69.)

In plaintiff's "Function Report to the Division of Disability Determinations," submitted on June 12, 2008, plaintiff reported that he was able to care for himself, but that his knees hurt when he had to bend them. (Id. at 73.) He could not stand for long periods of time and his balance was impaired. (Id.) He needed help doing laundry, washing dishes, and cleaning the apartment. (Id. at 74.) Plaintiff also

reported that his injured knee affected his ability to lift, sit, walk, climb stairs, kneel, and squat. (Id. at 76.) He used the cane prescribed to him by Dr. Bryk, and could walk five to ten minutes before needing to rest. (Id. at 77.) Plaintiff also reported taking 750 mg of Vicodin twice a day to alleviate the pain in his left knee. (Id. at 80.) The Vicodin took "about an hour to kick in" and it relieved the pain for "the whole day." (Id.)

On June 27, 2008, plaintiff returned to Dr. Bryk for a follow-up examination. (Id. at 228.) Dr. Bryk noted the plaintiff was attending physical therapy. (Id.) A physical examination revealed the wounds from the operation had healed; the range of motion of the left knee was from "near 0 [degrees] of extension to 130 [degrees] of flexion." (Id.) There was "diffuse tenderness anteriorly in the peripatellar region." (Id.)

At the request of the Division of Disability Determination, on August 7, 2008, Dr. Jerome Caiati ("Dr. Caiati"), an internal medicine physician, performed an internal medicine examination of plaintiff. (Id. at 232.) Plaintiff complained of pain and swelling of the left knee. (Id.) Plaintiff also mentioned that he had experienced right knee pain since 2002, after tearing a ligament. (Id.) At the time of the consultative examination, plaintiff reported that he was taking

hydrocortone with Tylenol and using his cane all the time for the pain. (Id. at 232-33.)  Dr. Caiti observed that the plaintiff "appeared to be in no acute distress."  (Id. at 233.) He walked with a "minimal limp" on the left, and walked on his heels and toes with "minimal difficulty."  (Id.)  He did not need help changing clothes for the exam or for getting on or off the exam table.  (Id.)  He was able to rise from a chair without difficulty and could hold a half squat, although he complained of pain in the left knee while doing so.  (Id.)  Plaintiff said he was able to cook, clean, do laundry, and go shopping, as well as take care of his personal hygiene.  (Id. at 232.)

Dr. Caiati recorded a "guarded" prognosis for the left knee.  (Id. at 235.)  He concluded that plaintiff's ability to sit, bend, reach, push, and pull were unrestricted, but that standing, walking, climbing and lifting had "minimum limitation due to left knee pain."  (Id.)

On August 28, 2008, Dr. Bryk met with plaintiff for a follow-up examination.  (Id. at 260.)  Plaintiff was still attending physical therapy and continued to complain of "persistent discomfort about the left knee."  (Id.)  Dr. Bryk's physical examination of the left knee revealed full range of motion and diffuse tenderness anteriorly in the peripatellar region.  (Id.)  Dr. Bryk diagnosed peripatellar tendonitis in the left knee.  (Id.)  He prescribed Vicodin and instructed

plaintiff to continue physical therapy and to return in a month. (Id.)

The following day, on August 29, 2008, Disability Examiner J. Ireland ("Ireland") met with plaintiff to assess his Residual Functional Capacity ("RFC"). (Id. at 141-47.) Ireland noted that plaintiff had a minimal limp and was able to walk with minimal difficulty. (Id. at 143.) Plaintiff was able to ambulate without a cane, get on and off the exam table and undress without assistance, and rise from a seated position without difficulty. (Id. at 145.) Plaintiff was also able to perform a half squat and had full range of movement, except in the lumbar spine, hips, left knee, and left ankle. (Id. at 143.) Ireland recorded that plaintiff could stand, sit, and walk with normal breaks for about 6 hours in an 8-hour workday, occasionally lift 20 pounds, frequently lift 10 pounds, and perform unlimited pushing/pulling. (Id. at 142.) He concluded that it would be reasonable to limit plaintiff's physical RFC to light work with the environmental limitations of avoiding concentrated exposure to extreme temperatures, wetness, humidity, and fumes/dust/poor ventilation. (Id. at 144-46.)

On October 2, 2008, Dr. Bryk again met with plaintiff, who continued to complain of persistent discomfort about the left knee. (Id. at 261.) Dr. Bryk instructed plaintiff in home exercises and told him to return in three months. (Id.)

On November 25, 2008, six months after plaintiff's second arthroscopy, plaintiff continued to complain of persistent discomfort about the left knee and once again met with Dr. Bryk. (Id. at 262.) Dr. Bryk, as in his previous examinations, noted that plaintiff's left knee had a full range of motion and there was diffuse tenderness anteriorly in the peripatellar region. (Id.) He again instructed plaintiff in home exercises and advised plaintiff to return in one month. (Id.)

On February 3, 2009, at another examination, Dr. Bryk opined that plaintiff "continues to demonstrate persistent pain and instability about the left knee joint" and that the physical therapy exercises have provided "limited relief." (Id. at 263.) The plaintiff remained "unable to work." (Id.) Dr. Bryk noted that a physical examination of the left knee revealed diffuse tenderness along the medial and lateral joint lines, and diagnosed recurrent internal derangement of the left knee. (Id.) He prescribed Vicodin and ordered an MRI examination to rule out recurrent intraarticular pathology. (Id.)

On March 3, 2009, plaintiff visited Dr. Bryk's office for another appointment. (Id. at 264.) Dr. Bryk concluded that the plaintiff "failed a left knee arthroscopy performed on May 27, 2008." (Id.) He noted that plaintiff "initially regained strength in his left knee following the surgery but has since

10

deteriorated gradually over the course of the past several months." (Id.) The plaintiff "continues to complain of persistent swelling in the left knee." (Id.) Upon physical examination of the knee, Dr. Bryk noted tenderness along the medial joint line and moderate effusion. (Id.) The range of motion was from -5 degrees of extension to 130 degrees of flexion with tenderness. (Id.) The MRI examination revealed evidence of a recurrent tear of the medial meniscus. (Id.) Dr. Bryk diagnosed a recurrent tear of the medial meniscus in the left knee, and advised plaintiff to undergo repeat left knee arthroscopy with resection of intraarticular pathology. (Id.) Dr. Bryk noted that plaintiff was "eager to undergo this procedure as soon as possible." (Id.)

### D. **April 1, 2009 Surgery**

On April 1, 2009, Dr. Bryk performed the third left knee arthroscopy on plaintiff. (Id. at 253.) In his operative report, Dr. Bryk diagnosed torn medial meniscus, left knee synovitis, and chondromalacia of patella. (Id.) He prescribed range of motion and strengthening exercises, pain modalities, and Vicodin. (Id. at 266-67.)

### E. **July 31, 2009 ALJ Hearing**

After plaintiff's June 3, 2008 application for disability benefits was initially denied on September 2, 2008 (Id. at 32-36), plaintiff then requested and was granted a

hearing before Administrative Law Judge Mark Solomon ("ALJ"),
which took place on July 31, 2009.  (Id. at 11, 32-36, 67-69.)
At the hearing, plaintiff testified and was represented by
counsel.  (Id.)

Plaintiff testified that, besides his knee, the only
other physical problem limiting his ability to work is asthma.
(Id. at 15.)  He said that the "dust and stuff" slows his
breathing, but that he does not currently use a "pump" because
he does not have the benefits to get one.  (Id. at 15-16.)  He
acknowledged that the asthma "comes and goes" and agreed that it
is "not a severe problem."  (Id. at 16.)

Regarding his left knee, plaintiff testified that
neither the second nor the third surgery improved the pain.
(Id. at 23.)  Plaintiff described the pain as "shoot[ing] from
my leg to my hip and to my lower back."  (Id. at 16.)  Plaintiff
has continued to use a cane.  (Id. at 21.)  He testified that
the day before the hearing, he visited Dr. Bryk and told him
that his knee was swollen and sore, and that he was scared to
walk because it felt like the knee was going to "give out
again."  (Id. at 24.)  Dr. Bryk prescribed Vicodin for the pain.
(Id. at 20.)  At the visit, plaintiff asked Dr. Bryk for an MRI
because his left knee felt the same way it did before each of
the three surgeries, but Dr. Bryk said it was too early for an

MRI.  (Id. at 23-24.)  Plaintiff testified that he is considering having another operation.  (Id. at 24.)

Plaintiff takes Vicodin twice a day, which relieves the pain for "a good three hours and then after that I start feeling it again."  (Id. at 21.)  He noted that he waits in between dosages because "it's no good to take . . . pill after pill like that."  (Id. at 25.)  He stated that the pain is "continuous" and without the Vicodin he cannot walk or stand.  (Id. at 21, 25.)  With Vicodin, plaintiff can stand about fifteen to twenty minutes, put his weight on his right leg, and sit for forty minutes before he starts to feel numb in his left lower hip area.  (Id. at 21-22.)  He can walk half a block.  (Id. at 22.)  Plaintiff testified that he does not experience any side effects from the Vicodin.  (Id.)

Plaintiff testified that he lives by himself and that he is able to drive himself to appointments, take cabs, and take public buses by himself.  (Id. at 18-19.)  He is also able to shower and dress himself, albeit slowly.  (Id. at 19.)  He is able to prepare food in the microwave for himself.  (Id.)  A friend visits to help him with laundry and grocery shopping.  (Id. at 19-20.)  Plaintiff said that he can buy groceries alone "once in a while but I can't do it for long" due to the pain.  (Id. at 20.)

Plaintiff testified that on a typical day, he relaxes at home and goes to appointments. (Id. at 20.) He also watches television and movies. (Id. at 20, 22-23.) Plaintiff stated that ever since his knee "got messed up" in 2002, and then again in 2008 and 2009, "[I]t feels like my life is over now because I'm not the same person as I was before . . . ." (Id. at 26.)

### E. Additional Evidence Submitted to the Appeals Council

Plaintiff's application for SSD benefits was denied by the ALJ on September 18, 2009. (Id. at 284.) Plaintiff requested review by the Appeals Council and submitted additional evidence of an MRI examination of plaintiff's right knee, dated May 24, 2010. (Id. at 279-80.) On May 24, 2010, Dr. Daniel Beyda ("Dr. Beyda") analyzed an MRI examination of plaintiff's right knee, which has not been operated upon. (Id. at 280.) Dr. Beyda found two nonspecific cysts "which may represent synovial cysts or ganglion cysts." (Id.) He also stated that an "underlying tear cannot be definitively excluded." (Id.)

### III. Procedural History

Plaintiff applied for Social Security disability benefits on June 3, 2008, alleging a disability onset date of April 4, 2008. (Id. at 67-69.) His application was initially denied on September 2, 2008, by the Regional Commissioner. (Id. at 32-36.) Plaintiff then requested and was granted a hearing before Administrative Law Judge Mark Solomon ("ALJ"). (Id. at

14

39-47.)  The hearing took place on July 31, 2009, at which time plaintiff testified and was represented by counsel.  (Id. at 11.)

On September 18, 2009, the ALJ issued a decision denying plaintiff's claims after *de novo* review of the record pursuant to the Social Security Administration's five-step sequential evaluation process for determining whether an individual is disabled.  (Id. at 284-89; 20 C.F.R. § 404.1520(a).)

Under step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since April 4, 2008, the alleged disability onset date.  (Id. at 286.)

Under step two, the ALJ found that plaintiff had the following "severe impairments: left knee meniscal tear, recurrent left knee synovitis, and chondroplasty of left knee." (Id.)

Under step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P.  (Id.)

Prior to step four, the ALJ determined that plaintiff had the residual functional capacity to perform the full range of sedentary work, except limited to occasional kneeling,

climbing stairs/ramps, balancing, stooping, crouching, and crawling; and no climbing ropes, ladders or scaffolds. (Id.)

In determining plaintiff's residual functional capacity, the ALJ followed a two-step process: (a) he determined whether the medically determinable impairments could reasonably be expected to produce the plaintiff's pain or other symptoms; and (b) he evaluated the extent to which the intensity, persistence, and limiting effects of the plaintiff's symptoms limit his ability to do basic work activities. (Id. at 287.) Under the first step, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Id.) However, under the second step, the ALJ found that plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible and were inconsistent with the residual functional capacity assessments of Drs. Montalbano, Samuels, and Caiati. (Id.)[2] The three referenced evaluations occurred before plaintiff received his third knee arthroscopy on April 1, 2009.

_____

[2]     The ALJ noted that Dr. Montalbano, in his April 8, 2008 evaluation, found that plaintiff could perform sedentary work. (Tr. 287.) Dr. Samuels, who evaluated plaintiff on May 15, 2008, concluded that plaintiff had a mild partial disability and was capable of working with restrictions of no squatting, bending, or lifting over 40 pounds. (Id.) Finally, the ALJ noted that he gave the opinion of Dr. Caiati "fairly considerable weight" because he gave plaintiff a thorough examination and his findings were consistent with other medical evidence in the record. (Id. at 288.)  Dr. Caiati, who examined plaintiff on August 7, 2008, concluded that plaintiff was unrestricted in his ability to sit, bend, reach, push and pull, and had minimal limitations on his ability to stand, walk, climb, and lift. (Id. at 287-88)

16

The ALJ did not explicitly reference any opinions by Dr. Bryk,
the plaintiff's treating physician who performed all three
surgeries and who saw plaintiff as recently as one day before
the hearing.[3]

Under step three, the ALJ thus determined that
plaintiff did not suffer from a "per se" disabling impairment
noted in Appendix 1 to 20 C.F.R. § 404.  Based upon the medical
evidence and evidence that plaintiff lives alone, can use public
transportation and drive, maintains his activities of daily
living, and takes Vicodin for pain without side effects, the ALJ
found that plaintiff has the residual functional capacity to
perform the full range of sedentary work with stated
limitations.  (Id. at 288.)

Under step four, the ALJ found that plaintiff was
unable to return to his past relevant work as a plasterer
helper, as it is a "heavy work."  (Id.)

Under step five, the ALJ found that plaintiff was
capable of sedentary performing jobs that exist in significant
numbers in the national economy, given his age, education, work
experience, and residual functional capacity.  (Id.)  Plaintiff
was 42 years old on the date of the alleged disability onset
date, has a high school education, can communicate in English,

---

[3]     The ALJ's single mention of plaintiff's treating physician was made in
passing: "The record does not contain any opinions from treating or examining
physicians indicating that the claimant has limitations greater than those
determined in this decision." (Tr. 288.)

and could perform sedentary work with certain limitations.

(Id.)  Accordingly, the ALJ concluded that in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, plaintiff was not disabled under the meaning of the Social Security Act.  (Id. at 289.)

Plaintiff requested review of the ALJ hearing decision on September 30, 2009.  (Id. at 28.)  The Appeals Council denied review on June 18, 2010.  (Id. at 6.)  Plaintiff then submitted new evidence of an MRI examination of his right knee.  (Id. at 279-80.)  After consideration of the new evidence, the Appeals Council again denied review on July 16, 2010, thus making the ALJ's decision the final decision of the Commissioner.  (Id. at 1.)

On August 13, 2010, plaintiff filed the instant action seeking review of the ALJ decision.  (ECF No. 1, Pl.'s Compl, filed Aug. 13, 2010.)  Defendant served its motion for judgment on the pleadings and filed the motion with the court on May 31, 2011.  (ECF No. 16, Def. Mot.)  Plaintiff is proceeding *pro se* and did not file an opposition, despite having been served with notice of defendant's motion on April 12, 2011.  (ECF No. 12, Letter from defense counsel to plaintiff, dated April 12, 2011.)

**DISCUSSION**

**I. Standard of Review**

### A. The Substantial Evidence Standard

In reviewing the ALJ's decision to deny Social Security disability benefits, the court does not determine *de novo* whether plaintiff is disabled, but sets aside the ALJ's decision only where it is based on legal error or is not supported by substantial evidence in considering the record as a whole.  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); see Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Halloran, 362 F.3d at 31 (internal citation and quotation marks omitted).  The reviewing court, in determining whether findings are supported by substantial evidence, "may not substitute its own judgment for that of the [ALJ], even if it might justifiably have reached a different result upon a *de novo* review" of the record.  Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).

### B. The ALJ Has an Affirmative Duty to Develop the Record

Notwithstanding the deferential standard of review given the ALJ's factual findings, an "ALJ's failure to apply the correct legal standards is grounds for reversal [or remand]. Legal error may include failure to adhere to the applicable

19

regulations." <u>Hilsdorf v. Comm'r Soc. Sec.</u>, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010) (citations and internal quotation marks omitted).  Unlike a trial judge, the ALJ "must . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." <u>Pratts v. Chater</u>, 94 F.3d 34, 37 (2d Cir. 1996) (internal citation and quotation marks omitted); <u>see also</u> 20 C.F.R. § 702.338.  The ALJ's regulatory obligation to develop the administrative record "exists even when, as here, the claimant is represented by counsel" at the hearing.  <u>Pratts</u>, 94 F.3d at 37; <u>see</u> <u>Rosa v. Callahan</u>, 168 F.3d 72, 79 (2d Cir. 1999).

Where the administrative record contains gaps and further findings would "plainly help to assure the proper disposition of the [disability] claim," remand for further development of the evidence is appropriate.  <u>Butts v. Barnhart</u>, 388 F.3d 377, 385 (2d Cir. 2004) (internal citation and quotation marks omitted); <u>see also</u> <u>Hilsdorf</u>, 724 F. Supp. 2d at 344 ("When the ALJ perceives a gap in the record concerning the findings of a treating physician, the ALJ has an affirmative obligation to seek out the missing information") (citation omitted).

## II. Legal Standards for Disability Claims

### A. The Commissioner's Five-Step Analysis of Disability Claims

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A). The ALJ engages in a five-step sequential analysis to determine whether a claimant is disabled under the meaning of the Act. 20 C.F.R. § 404.1520. If the claimant is found to not be disabled at any step, the analysis ends at that step and the ALJ need not proceed further.

For the claimant's condition to constitute a disability, the ALJ must determine

> (1) that the claimant is not working,[4] (2) that he has a 'severe impairment,'[5] (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability,[6] and (4) that the claimant is not capable of continuing in his

---

[4]     Under step one, the ALJ considers the claimant's work activity, if any. If the claimant is doing any substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i).

[5]     Under step two, the claimant must have a severe medically determinable physical or mental impariment that meets the duration requirement in § 404.1509. 20 C.F.R. § 404.1520(a)(4)(ii).

[6]     Under step three, if the claimant has an impairment that meets or equals a listing in Appendix 1 and that meets the duration requirement, the ALJ will automatically find the claimant disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

prior type of work[7] . . . [and] (5) there is not
another type of work the claimant can do.[8]

Burgess, 537 F.3d at 120.  The claimant bears the burden of

establishing the disability requirements at steps one through

four.  Butts, 388 F.3d at 383.  At the fifth step, the burden

shifts to the Commissioner to establish that the claimant, given

his physical capability, age, education, experience, and

training, is capable of performing "alternative substantial

gainful work which exists in the national economy."  Rosa, 168

F.3d at 77.

## B.  The Treating Physician Rule

The claimant's treating physician's opinion regarding

the nature and severity of the claimant's impairment should be

given controlling weight "so long as it is well-supported by

medically acceptable . . . diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case

record."[9]  Burgess, 537 F.3d at 128; see also 20 C.F.R.

§ 404.1527(d)(2).

---

[7]     In steps four and five of the analysis, the ALJ relies on his
assessment of the claimant's residual functional capacity ("RFC"), which is
the most the claimant can do in a work setting given his physical and/or
mental limitations and any related symptoms.  20 C.F.R. § 416.945(a).
     At step four, the ALJ considers the claimant's residual functional
capacity and past relevant work.  If the claimant can still do his past
relevant work, he is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).
[8]     At step five, the ALJ assesses the claimant's residual functional
capacity together with his age, education, and work experience to "see if
[claimant] can make adjustment to other work."  If the claimant can make an
adjustment to other work, he is not disabled.  20 C.F.R. § 404.1520(a)(4)(v).
[9]  Medically acceptable clinical and laboratory diagnostic techniques "include
consideration of [a] patient's report of complaints, or history, as an

Treating physicians are afforded controlling weight because they are more likely to be "able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone" or from individual examinations.  20 C.F.R. § 404.1527(d)(2).  Following the same reasoning, a consulting physician's opinion should be given "limited weight" because consultative exams "at best, only give a glimpse of the claimant on a single day" and "[o]ften . . . ignore or give only passing consideration to subjective symptoms without stated reasons."  <u>Cruz v. Sullivan</u>, 912 F.2d 8, 13 (2d Cir. 1990) (internal citation and quotation marks omitted).  Because the treating physician's opinion is generally accorded controlling weight, it is "an especially important part of the record to be developed by the ALJ."  <u>Hilsdorf</u>, 724 F. Supp. 2d at 343; <u>see</u> <u>Rosa</u>, 168 F.3d at 79 (the ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record").

When the ALJ declines to give controlling weight to the treating physician's opinion in the disability decision, the ALJ must give "good reasons" for the weight assigned to the

---

essential diagnostic tool."  <u>Burgess</u>, 537 F.3d at 128 (citing <u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 107 (2d Cir. 2003)).

treating physician's opinion.  20 C.F.R. § 404.1427(d)(2).  The

ALJ must consider six regulatory factors in determining how much

weight to ultimately assign the treating physician's opinion:

> (1) length of treatment relationship and
> frequency of examination; (2) nature and extent
> of the treatment relationship; (3) supportability
> [i.e., the degree of explanation given in the
> opinion]; (4) consistency [with the record as a
> whole]; (5) specialization; (6) other factors
> such as the treating physician's familiarity with
> disability programs and with the case record.

20 C.F.R. § 404.1527(d)(2)(i)-(ii); § 404.1527(d)(3)-(6).

Although the ALJ need not expressly go through each factor in

his decision when it is "nevertheless clear from the record as a

whole that the ALJ properly considered" the factors, see Petrie

v. Astrue, 412 F. App'x 401, 407 (2d Cir. 2011), the ALJ must

nevertheless give good reasons in his decision for not crediting

the opinion of the treating physician.  Snell v. Apfel, 177 F.3d

128, 133 (2d Cir. 1999).  The "requirement of reason-giving

exists, in part, to let claimants understand the disposition of

their cases, even -- and perhaps especially -- when those

dispositions are unfavorable."  Id. at 134.

Thus, an ALJ's failure to provide good reasons for not

assigning controlling weight to the opinion of the treating

physician "is a ground for remand."  Id. at 133; see, e.g.,

Caserto v. Barnhart, 309 F. Supp. 2d 435, 444 (E.D.N.Y. 2004)

(remanding because the ALJ failed to acknowledge two treating

24

physicians' opinions, to indicate how much weight he gave one
treating physician's opinion, and did not provide good reasons
for not crediting the treating physicians' opinions).

## C. Assessing Plaintiff's Credibility

When the claimant purports to experience symptoms such
as pain, the ALJ must consider "the extent to which the
claimant's symptoms can reasonably be accepted as consistent
with the objective medical evidence and other evidence of
record."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010)
(internal citation and quotation marks omitted).  The ALJ
follows a two-step process to evaluate a claimant's testimony
regarding symptoms such as pain.  20 C.F.R. §§ 404.1529(b),
416.929(b).  First, the ALJ must consider whether the claimant
has a medically-determinable impairment which could reasonably
be expected to produce the pain or symptoms alleged by the
claimant.  Id.  This requirement "stems from the fact that
subjective assertions of pain *alone* cannot ground a finding of
disability."  Genier, 606 F.3d at 49 (emphasis in original).
Second, if the claimant makes statements about symptoms that are
not supported by medical evidence, then the ALJ must make a
finding as to the claimant's credibility.  See Alcantara v.
Astrue, 667 F. Supp. 2d 262, 277 (S.D.N.Y. 2009).  In assessing
the claimant's credibility, the ALJ must consider all objective
medical evidence as well as various regulatory factors including

the claimant's daily activities, the nature of the pain, the effectiveness of any medication taken, and other measures the claimant uses to relieve pain.[10]  If the ALJ finds that the witness is not credible, the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."  Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988); see Alcantara, F. Supp. 2d at 278.  The ALJ's credibility determination and decision to discount a claimant's subjective complaints of pain are entitled to "great deference" only if supported by substantial evidence.  See Alcantara, 667 F. Supp. 2d at 277; Hilsdorf, 724 F. Supp. 2d at 350 (citing Aponte v. Sec'y Dep't of Health and Human Servs., 728 F.2d 588, 591 (2d Cir. 1984)).

---

[10]     The full list of regulatory factors includes:
        (i) Your daily activities;
        (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
        (iii) Precipitating and aggravating factors;
        (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
        (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
        (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
        (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.
20 C.F.R § 404.1529(c)(3).

## III. Application

### A. The ALJ Failed to Adhere to the Treating Physician Rule

An ALJ's failure to consider the treating physician's
opinion in the disability decision is clear legal error and
ground for remand.  The Social Security Administration
Regulations and the Second Circuit case law are clear in
requiring an ALJ to give a treating physician's opinion
controlling weight if it is based on medically acceptable
diagnostic techniques and is not inconsistent with other
substantial evidence.  Burgess, 537 F.3d at 128; 20 C.F.R.
§ 404.1527(d)(2).  If an ALJ declines to accord controlling
weight to the treating physician's opinion, he must consider six
regulatory factors in determining how much weight to assign the
treating physician's opinion and give good reasons in his
decision.  20 C.F.R. § 404.1527(d)(2).

Here, the ALJ only cited the opinions of consulting
Drs. Montalbano, Samuels, and Caiati in his decision; he did not
once mention plaintiff's treating physician, Dr. Bryk.  (Tr.
287-88).  The ALJ noted that "the opinions of Drs. Montalbano
and Samuels support the finding that the claimant has the
residual functional capacity to performed sedentary work" with
certain restrictions, and added that he gave "fairly
considerable weight to the consultative examiner Dr. Caiati"
because Dr. Caiati's report "reveals that he gave claimant a

27

thorough examination and his findings were consistent with other medical evidence in the record." (Id. at 288.) The ALJ described the opinions of the one-time examiners in detail, while merely noting that "[t]he record does not contain any opinions from treating or examining physicians indicating that the claimant has limitations greater than those determined in this decision." (Id.)

Thus, the court finds that the ALJ committed legal error in not only failing to give good reasons for not assigning controlling weight to Dr. Bryk's opinion, but also for failing to mention Dr. Bryk at all, indicating that his opinions and ongoing treatment history with plaintiff were not considered. The ALJ's decision also shows that the ALJ did not consider the six regulatory factors under 20 C.F.R. § 404.1527(d)(2)-(6) in deciding to ignore the treating physician's opinion. Further, the ALJ failed to give good reasons for according the non-treating physicians substantial weight. See Canales v. Comm'r of Soc. Sec., 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010) (noting that the ALJ should use the same regulatory factors to evaluate the opinions of both treating and non-treating medical sources).

The ALJ's failure to observe the treating physician rule in his decision is especially critical here because none of the doctors that the ALJ referenced examined plaintiff during the period when plaintiff's condition had allegedly worsened.

Plaintiff testified, and Dr. Bryk's medical reports corroborate, that after the May 27, 2008 surgery, plaintiff's condition initially improved and then deteriorated. On March 3, 2009, after repeated follow-up examinations, Dr. Bryk evaluated plaintiff and concluded that plaintiff had "initially regained strength in his left knee following the surgery but has since gradually deteriorated over . . . the past several months." (Tr. 264.) After no improvement in plaintiff's condition, Dr. Bryk performed a third left knee arthroscopy on plaintiff on April 1, 2009. (Id. at 253.)

Drs. Montalbano, Samuels, and Caiati did not examine plaintiff during the alleged deterioration period and did not see him after the third surgery. Dr. Montalbano examined plaintiff on April 8, 2008, four days after the alleged onset date of injury. (Id. at 243). Dr. Samuels saw plaintiff on May 15, 2008, prior to plaintiff's second surgery. (Id. at 114.) Dr. Caiati examined plaintiff on August 7, 2008, more than six months before Dr. Bryk concluded that plaintiff had failed the second left knee arthroscopy. (Id. at 232). If plaintiff's condition had indeed worsened after the second surgery to the extent that it affected his ability to perform work, the three non-treating physicians' opinions would not have captured this development; thus, the ALJ's exclusive reliance on the non-treating physicians' opinions was inappropriate.

Because the ALJ failed to give good reasons for declining to give controlling weight, much less any consideration, to the opinion of Dr. Bryk and for relying on the opinions of the three non-treating physicians, the court finds that the ALJ committed legal error in his decision and that remand is appropriate.  See, e.g., Snell, 177 F.3d at 133 ("Failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand.").

## B. The ALJ Failed to Affirmatively Develop the Record

As discussed above, plaintiff underwent a third knee arthroscopy on April 1, 2009, after Dr. Bryk determined that plaintiff failed the second arthroscopy.  The ALJ, however, did not discuss plaintiff's allegedly deteriorated condition and failed to mention plaintiff's third surgery in his decision, instead choosing to rely on the opinions of physicians who saw plaintiff prior to the alleged deterioration.  Moreover, besides plaintiff's testimony that he saw Dr. Bryk and still experienced pain the day before the hearing (Tr. 24), the record is silent on the issue of plaintiff's recovery and condition after the third surgery.

It is well-established that the ALJ has an affirmative obligation to develop the administrative record where gaps exist, particularly when "further findings would so plainly help to assure the proper disposition of the claim."  Butts, 388 F.3d

at 385 (internal citation and quotation marks omitted).  In addition, the "opinion of a treating physician is an especially important part of the record to be developed by the ALJ." Hilsdorf, 724 F. Supp. 2d at 343.  If the evidence on record is inadequate to determine whether a claimant is disabled, the ALJ "must re-contact the claimant's medical source to gather additional information."  Id. at 344 (internal citation and quotation marks omitted) (remanding because ALJ did not mention treating physician's opinion and failed to properly develop plaintiff's relevant medical history); see also 20 C.F.R. § 404.1512(e)(1) (ALJ "may [fulfill obligation to develop the record] by requesting copies of the claimant's medical source's records, a new report, or a more detailed report . . . .").

     Here, further evidence of plaintiff's condition after the third surgery would undoubtedly help in determining whether plaintiff is truly disabled under the meaning of the Act. Because the administrative record did not contain any medical evidence concerning plaintiff's condition after the third surgery, and the ALJ did not provide any reasonable explanation for his failure to obtain these records, the court finds that the ALJ did not fulfill his affirmative duty to develop the medical record.  Accordingly, the court remands for further development of the record.  On remand, the ALJ should obtain

from Dr. Bryk an assessment of plaintiff's residual functional capacity after the third surgery.

### C. The ALJ Must Clarify Limitations on Plaintiff's Daily Activities Due to Symptoms of Pain Based on Evidence from Plaintiff's Treating Physician

In addition to correcting the above errors that, standing alone, require remand, the ALJ should also, upon reconsideration of plaintiff's application, clarify how plaintiff's complaints of pain limit his daily activities and ability to perform work in light of evidence from plaintiff's treating physician.  The ALJ cannot reject a claimant's allegations of pain solely because they are not substantiated by objective medical evidence.  20 C.F.R. § 404.1529(c)(2).  Rather, the ALJ must consider seven regulatory factors to evaluate the claimant's symptoms, including the claimant's daily activities.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).  When a claimant makes statements about symptoms of pain, the ALJ must consider "the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record."  *Genier*, 606 F.3d at 49 (internal citation omitted).  Where the ALJ decides that the claimant's complaints of pain are not credible, and this decision is based not based on substantial evidence, then remand is appropriate.  *Rosa*, 168 F.3d at 82 n.7; *Alcantara*, 667 F. Supp. 2d at 277.

Here, in assessing plaintiff's subjective complaints
of pain, the ALJ conceded that plaintiff's medically
determinable impairments "could reasonably be expected to cause
the alleged symptoms." (Tr. 287). However, the ALJ found that
plaintiff's claims were "not credible to the extent they are
inconsistent with the . . . residual functional capacity
assessment" based on the reports of Drs. Montalbano, Samuels,
and Caiati. (Id. at 287-88.) The ALJ also noted that claimant
"lives alone, can use public transportation, can drive,
maintains his activities of daily living, and takes Vicodin for
pain when needed without side effects." (Id. at 288.)

As discussed above, the ALJ's almost exclusive
reliance on the medical opinions of Drs. Montalbano, Samuels,
and Caiati, without mention of Dr. Bryk's opinion, constitutes
error. As such, the residual functional capacity assessment
based on the three non-treating physicians' reports does not
meet the standard of substantial evidence for the ALJ's
determination that plaintiff's complaints of pain were not
credible. Because the ALJ's findings in this case did not
properly consider the opinions of plaintiff's treating
physician, the assessment of plaintiff's credibility with
respect to his symptoms of pain was also necessarily based on an
incomplete record. Accordingly, remand is appropriate for the

ALJ to assess plaintiff's complaints of pain in light of a fully
developed record.

Moreover, the ALJ failed to clarify during the hearing
the particular nature of plaintiff's daily activities, which is
a relevant factor in determining whether symptoms of pain are
credible. Where, as here, the medical record contained a number
of references to plaintiff's subjective symptoms of pain, "it
was particularly important that the ALJ explored these symptoms
with plaintiff so that the ALJ could effectively exercise his
discretion to evaluate the credibility [of the claimant to]
arrive at an independent judgment . . . regarding the true
extent of the pain alleged." Hankerson v. Harris, 636 F.2d 893,
895-96 (2d Cir. 1980) (internal citation and quotation marks
omitted).

Instead, the ALJ failed to elicit details at the
hearing regarding how plaintiff's allegations of pain limited
his daily activities. For example, plaintiff testified at the
hearing that he received assistance in doing laundry and going
grocery shopping, yet the ALJ did not question plaintiff
further, instead relying on Dr. Caiati's report to conclude in
his decision that plaintiff "admitted that he is able to cook,
clean, do laundry, go shopping, and groom himself." (Id. at

288.)[11]  The ALJ also found that plaintiff was able to cook and

drive (id.), when plaintiff testified that he occasionally

microwaved food and drove only to go to appointments.  (Id. at

18-19.)

     Thus, the ALJ failed to ascertain the particular

nature of plaintiff's daily activities during the hearing, and

either discredited or ignored plaintiff's stated limitations on

these activities in his disability decision.  If the ALJ had any

misgivings about plaintiff's subjective symptoms and how they

affected plaintiff's daily functioning, the ALJ "could easily

have resolved any such uncertainties by questioning [p]laintiff

further at the hearing."  Hilsdorf, 727 F. Supp. 2d at 352.

Because the ALJ did not take the opportunity to do so, and

because the ALJ relied on medical reports by consulting

physicians made prior to plaintiff's alleged deterioration in

condition, "there is nothing to suggest that [p]laintiff engaged

in any of these [daily] activities for sustained periods

comparable to those required to hold [even] a sedentary job."

Id. (citing Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998))

(internal quotation marks omitted).

---

[11] Plaintiff testified that his friend comes over to assist him in doing
laundry and buying groceries.  (Tr. 19-20.)  Plaintiff explained that he
sometimes sends his friend out to go grocery shopping because he can only "do
it once in a while but I can't do it for long" due to pain.  (Id. at 20.)
The ALJ did not inquire further about how often and for how long plaintiff
can go shopping alone.  In addition, as discussed above, Dr. Caiati's
evaluation of plaintiff took place prior to plaintiff's alleged deterioration
in condition and before plaintiff's third surgery, and as such, may not
provide an accurate picture of plaintiff's symptoms of pain.

The Second Circuit has repeatedly recognized that "[a] claimant need not be an invalid to be found disabled." Williams, 859 F.2d at 260 (internal citation and quotation marks omitted); see also Carroll v. Sec'y Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983) (noting that although plaintiff occasionally read, watched television, rode public transportation, and sat still for the duration of the hearing, there was no substantial evidence that plaintiff could engage in sedentary work).  If a disabled person "gamely chooses to endure pain in order to pursue important goals . . . it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working." Balsamo, 142 F.3d at 81-82 (determining that plaintiff's attending church and occasionally helping his wife go shopping did not show that plaintiff could perform sedentary work).

The court holds, therefore, that the ALJ, in concluding that plaintiff's symptoms of pain were not credible, failed to acknowledge and develop plaintiff's allegations of pain, the underlying conditions found by plaintiff's treating physicians that would be expected to cause pain, and the restrictions on daily activities caused by plaintiff's pain. Upon reconsideration of plaintiff's claim, the ALJ should ascertain details clarifying the medical evidence of conditions that cause pain and how plaintiff's allegations of pain limit

his daily activities before determining whether plaintiff's
allegations of pain are credible.

## CONCLUSION

For the foregoing reasons, the court denies
defendant's motion for judgment on the pleadings and remands
this case for further proceedings consistent with this opinion.
Specifically, the ALJ shall:

(1)  Obtain from plaintiff's treating physician, Dr. Bryk,
     a residual functional capacity assessment of
     plaintiff's condition after the third surgery;

(2)  Consider the opinions of plaintiff's treating
     physicians, including Dr. Bryk, and give controlling
     weight to those opinions if they are based on medical
     evidence and not inconsistent with other substantial
     evidence on the record;

(3)  If the ALJ declines to assign Dr. Bryk's opinion
     controlling weight, provide a clear and explicit
     statement of what affirmative weight, if any, he
     affords Dr. Bryk's opinion and provide a clear and
     explicit statement of the "good reasons" for the
     weight given to Dr. Bryk's opinion in accordance with
     the regulatory factors listed in 20 C.F.R.
     §§ 404.1527(d)(2)-(6); and

(4) Further explore the underlying causes of plaintiff's
    plain how plaintiff's allegations of pain restrict
    plaintiff's daily activities before determining
    whether the allegations of pain are credible.


**SO ORDERED.**

Dated:     August 10, 2011
           Brooklyn, New York

                              _____/s/_____
                              Kiyo A. Matsumoto
                              United States District Judge